UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

L.K. on behalf of her minor son, Q,      :
                                          :
                            Plaintiff,    :
                                          :          **OPINION AND ORDER**
          - against -                     :
                                          :           11 Civ. 8458 (ER)
Northeast School District, also known as  :
Webutuck Central School District,         :
                                          :
                            Defendant.    :

————————————————————————x

     Plaintiff L.K. ("Plaintiff" or the "Parent") on behalf of her son, Q.S., brings an action

against the Northeast School District, also known as Webutuck Central School District

("Defendant" or the "District") under the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. § 1400 *et seq.*, seeking to overturn the determination of the State Review Officer

("SRO") that the District is not required to reimburse the Parent for her unilateral placement of

Q.S. at the Kildonan School ("Kildonan").  The parties have filed cross-motions for summary

judgment.  Docs. 11, 28.  For the reasons set forth below, Plaintiff's motion for summary

judgment is DENIED and the Defendant's motion for summary judgment is GRANTED.

## I.  Factual Background[1]

     Plaintiff Q.S., currently nine years old, has been diagnosed as having, among other

things, an anxiety disorder and attention deficit hyperactivity disorder ("ADHD").  He

---

[1] The Court has reviewed the administrative record provided by the parties.  The following facts are drawn from the
parties' Local Rule 56.1 Statements, transcripts of the testimony heard by the IHO, exhibits introduced at the IHO
hearing, and the decisions of the IHO and SRO.  References prefixed "Tr. _" refer to the transcript of the impartial
hearing conducted from February 17 to March 2, 2011.  "Ex. _" refers to the joint exhibits submitted by the parties
for the impartial hearing.  References to the "IHO Dec. at _" are to the May 30, 2011 Impartial Hearing Decision
and references to "SRO Dec. at _" are to the SRO's Decision dated July 29, 2011.  References to "Pl.'s 56.1 Resp.
¶_" refers to Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts and
"Def.'s Resp. 56.1 ¶_" refers to Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Undisputed
Material Facts.

demonstrates a range of needs in sensory processing and fine and gross motor performance.  He also has difficulties with writing, reading social cues, initiating activities, and interacting with peers.  Finally, Q.S. engages in impulsive behavior and lacks organizational skills.  IHO Dec. at 4.  The District has classified Q.S. as learning disabled and eligible for special education and related services; his classification is undisputed.  Pl.'s Resp. 56.1 ¶¶ 1-2.

### A. Educational History

In early 2005, when Q.S. was two years old, the Parent enrolled him in a nursery school program at the Rose Manor Day School ("Rose Manor") in Beacon, New York.  *Id.* ¶ 3.  At Rose Manor, Q.S. was placed in a class of ten students.  In this setting, he suffered from anxiety and experienced difficulty with sensory integration and transitions.  *Id.* ¶ 4.  His anxiety increased when he was moved to a classroom of twenty-two students at the age of three.  *Id.* ¶ 5; Tr. 63-64.

In May 2006, the Parent transferred Q.S. to the Nevaeh Montessori School ("Nevaeh"), where he was placed in a class with five children and two teachers.  Pl.'s Resp. 56.1 ¶ 5.  At Nevaeh, Q.S. continued to experience difficulties.  Specifically, his teacher advised that he could not work independently, required constant redirection, and had difficulty with fine motor activities and self-regulation.  He continued to experience anxiety, was becoming increasingly controlling, and was having trouble socially.  *Id.* ¶ 6.

In May 2007, when Q.S. was four years old, the Parent withdrew him from Nevaeh and enrolled him at the Wimpfheimer Nursery School Program of Vassar College ("Wimpfheimer") in Poughkeepsie, New York.  At Wimpfheimer, Q.S. attended pre-kindergarten and kindergarten.  *Id.* ¶ 7.  His pre-kindergarten class had nineteen students, two full-time teachers and one assistant teacher.  His kindergarten class had twenty-two or twenty-three students, together with two full-time teachers and one assistant teacher.  IHO Dec. at 6.  At Wimpfheimer, Q.S. received the

following services: occupational therapy ("OT"), physical therapy ("PT"), speech therapy, social skills sessions, and services from a special education itinerant teacher ("SEIT"). *Id.* ¶ 9. The Parent testified that during the second half of Q.S.' pre-kindergarten year, she began to receive feedback from Wimpfheimer that her son had difficulties with transitions and self-regulation, was very distracted, was struggling with hyperactivity, and easily became overwhelmed. He continued to struggle with those issues during his kindergarten year. IHO Dec. at 6-7. Also during that year, the Parent privately contracted for her son to receive Orton-Gillingham[2] tutoring in school three days per week. Tr. 72.

At the end of his kindergarten year, the Parent enrolled Q.S. in the first grade program at the Garden Road School ("Garden Road") in Crompond, New York after rejecting a public first grade inclusion class offered through the Beacon City School District ("Beacon SD"). Pl.'s Resp. 56.1 ¶ 31. His class included only ten students. IHO Dec. at 9. There, Q.S. received related services, either through the Beacon SD or the Lakeland School District, which included two hours a week of consultant teacher services, group speech therapy twice a week for thirty minutes, PT and OT. Pl.'s Resp. 56.1 ¶ 36. He remained at Garden Road through the end of the first grade, which was the 2009-10 school year. IHO Dec. at 12.

In preparation for the 2010-11 school year, Q.S.' second grade year and the relevant school year in this case, the Parent researched and visited a number of private schools, including Kildonan, in search of a special needs school for her child. The Parent's search occurred during the period from Fall 2009 to March 2010. Pl.'s Resp. 56.1 ¶ 50. On April 9, 2010, the Beacon

---

[2] Orton-Gillingham is an approach used to remediate the language skills of students with dyslexia or specific language-based reading disorders. Tr. 119. Kildonan's Academic Dean, Dr. Robert Lane, further described Orton-Gillingham as language-based 1:1 multisensory instruction presented in a direct and explicit fashion based on a student's individual needs. *Id.* at 120.

SD, Q.S.' then-district of residence, held an annual meeting of the Committee on Special Education ("CSE") to create an individualized education program ("IEP") for his 2010-11 school year.  *Id.* ¶ 51.  The resulting IEP recommended placement in a 12:1 integrated co-teaching second grade classroom at Beacon SD's elementary school with the support of a special education teacher's assistant, related services of 1:1 counseling twice a week and 1:1 OT two times a week.  Ex. 4 at 1-2, 6-7; Pl.'s Resp. 56.1 ¶ 52.  The Parent rejected Beacon SD's IEP. Pl.'s Resp. 56.1 ¶ 53.  Then, on April 14, 2010, the Parent signed a Student Enrollment Agreement with Kildonan for the 2010-11 school year.  *Id.* ¶ 54.

### B.  Testing of the Student

In February 2007, an OT evaluation conducted by Carolyn Machonis documented Q.S.' difficulty with sensory processing, sensory-motor abilities, and modulation, including modulation of motor skills, emotional reactivity and states of attention.  Ex. 18 at 5.  Dr. Patricia Thomas, Ph.D. ("Dr. Thomas"), a licensed psychologist who was privately hired by the Parent and first met Q.S. when he was four years old, reviewed Machonis' evaluation and commented that difficulty with modulation can have a range of manifestations, including those identified by Machonis.  *Id.*; IHO Dec. at 33; Def.'s Resp. 56.1 ¶ 12.

In March 2007, St. Francis Hospital and Health Centers ("SFFHC") conducted preschool program evaluations of Q.S. which included an educational assessment, a speech-language diagnostic evaluation, an OT evaluation and a psychological evaluation.  Ex. 18 at 5-6.  The educational assessment concluded that his readiness skills fell within the normal range of development.  *Id.* at 5.  The speech-language evaluation reported that Q.S. presented with inconsistent attention, weak pragmatic language skills, had difficulty organizing his language to express his thoughts and feelings when upset, and had difficulty staying on topic during a

conversation.  He also "worked to control the conversation interaction" by refusing to respond to certain topics.  *Id*.  The OT evaluation noted that Q.S. had difficulties with sensory processing, visual-motor integration, gravitational security, fine motor coordination, and postural control, which potentially impacted his capacity to engage with preschool materials, master developmental tasks and interact with his peers.  *Id*. at 6.  Finally, the psychological evaluation noted a "statistically significant discrepancy" between Q.S.' measured Verbal IQ of 131 and his measured Performance IQ of 108, and noted that behavioral profiles were "significant for emotional reactivity, anxiety or depression, somatic problems, withdrawn behavior, sleep problems, attention problems, and difficulty with aggression."  *Id.*

In June 2007, Dr. Thomas conducted a psychological diagnostic testing evaluation which determined that Q.S. had a "disruption in the baseline of executive/regulatory functions to organize and modulate" which impacted a broad range of functions, including his sensory processing, emotional intensity, behavioral expression and motor coordination.  *Id*.  She also noted that he was "presenting reactivity (modulation) without sufficient form (organization)" in various domains of self-expression, including behavioral, emotional, attentional and motoric areas.  *Id*. at 6-7.  Additionally, his efforts to "self-regulate" included shutting down, avoidance and attempting to control a situation.  Q.S. also exhibited difficulty with social reciprocity and reading social cues, which contributed to his feeling of social anxiety.  *Id*. at 7; Pl.'s Resp. 56.1 ¶ 18.

In May 2008, SFFHC conducted additional preschool evaluations of Q.S. which included an educational assessment and a speech and language evaluation.  Ex. 18 at 7; Pl.'s Resp. 56.1 ¶ 19.  The educational assessment noted that Q.S. experienced "significant delay" with self-help skills and challenges with gross motor skills.  Ex. 18 at 7.  The speech and language evaluation

noted "inconsistency" in his ability to follow directions, found that he had difficulty following a conversational topic, and that he needed frequent repetition and clarification of information.  *Id*. The assessment also noted that Q.S.' thinking was "literal and concrete," which caused problems in relation to abstract concepts.  *Id*.

A June 2008 Psychiatric Treatment Report prepared by Dr. Flemming Graae noted that the Q.S. "struggle[d] massively with an array of anxieties and challenges" including phobic anxieties, fears of catastrophe, separation or loss, and anxiety negotiating the social world.  The report also noted development delays in pragmatic language, sensory integration, attention and motor control.  *Id*. at 7-8.

In September 2008, a Test of Language Competence and Assessment of Literacy and Language performed by Dr. Thomas noted that Q.S. had difficulty discerning intent if something was not clearly spelled out and had difficulty shifting his thinking.  *Id*. at 8.

A November 7, 2008 School Consultation report prepared by Dr. Suzi Tortora, a dance movement psychotherapist who first began working with Q.S. when he was eighteen months old, observed that he had difficulty reading nonverbal cues, which contributed to controlling and avoiding behavior and hindered meaningful interaction with his peers.  *Id*.  Dr. Tortora's report also noted that Q.S. experienced distractibility, which made completing tasks difficult, and avoided activities that were challenging for him.  *Id*.

Also in November 2008, the Arlington Central School District ("Arlington SD") conducted a speech and language evaluation of Q.S. which indicated "a widened gap" between his receptive and expressive language skills.  *Id*. at 9; Ex. 24 at 3.

A December 15, 2008 OT evaluation by Suzanna Ward, physical therapist, noted that Q.S. presented with "a significant sensory processing disorder" which negatively impacted his

ability to function successfully in the classroom and at home.  He appeared to be unable to use auditory, visual and movement input effectively to make sense of what was happening around him.  He had an inability to process movement and touch input effectively.  His decreased tolerance for sensory input could cause him to become distressed and have difficulty working with peers.  Further, Q.S.' delays in his visual motor skills, if not addressed, could have a negative impact on his handwriting skills.  Exs. 18 at 9; 20 at 4-5.

A December 16, 2008 PT report noted that Q.S. demonstrated low average gross motor skills and he showed "significant delays" in the area of postural skills, which impacted his motor planning skills, bilateral coordination, core strength and overall physical endurance.  Ex. 24 at 4. The report also stated that Q.S. used "much cognitive energy" to perform ordinary physical movements, and recommended PT services.  Exs. 18 at 9; 21 at 3-4.

In October and November 2009, Dr. Thomas presented a Diagnostic Psychological Testing Evaluation of the Student.  Ex. 18 at 1.  As part of her evaluation, Dr. Thomas conducted a classroom observation of Q.S. at Garden Road and noted that he would stare off at times in his interactions with teachers and peers and that he avoided writing "at all cost."  *Id*. at 1, 3-4.  Dr. Thomas noted that:  (1) he "conveyed a level of internal pressure to perform that ran high;" (2) he presented as "anxious, pressured, distractible and highly sensitive to what felt hard for him;" (3) he had difficulty with writing and working efficiently; and (4) he found it hard to listen to directions and explanations.  *Id*. at 4-5.  Dr. Thomas' noted that his sensory processing disorder affected his ability to coordinate smooth motor responses, his ability to make sense of "cause-and-effect," and his ability to understand the meaning of events in his life.  *Id*. at 10.  Further, his sensory processing difficulties affected his ability to regulate his inner states of emotion, attention and impulsivity, and to engage in social reciprocity.  *Id*.  Dr. Thomas also noted deficits

in his executive function in the areas of organization and sequencing, social perception and attunement, visual discrimination, visual tracking, motor coordination, motor planning, visual-spatial orientation, and in graphomotor functioning. *Id.* at 11-20; Pl.'s Resp. 56.1 ¶ 41. Further, based on an examination of Q.S.' early reading skills and test results, Dr. Thomas reported that "while it would be accurate to say that he is reading at a first grade level he has been struggling to pull it off and he is not a fluent reader" and "[t]he picture that [Q.S.] presents is consistent with the diagnosis of dyslexia." Ex. 18 at 20-22; Pl.'s Resp. 56.1 ¶ 42.[3]

Finally, Dr. Thomas recommended that Q.S. receive a highly individualized academic program which offered structure and support for executive functions and which minimized the potential for Q.S. to become overstimulated or overwhelmed. Intervention for his learning disabilities and support therapies (speech-language and OT) should be integrated into the school day. Dr. Thomas also recommended a program of remedial reading which specifically addressed the "difficulty that he is experiencing conceptualizing where sounds fall in words and how to sequentially manipulate those sounds for spelling and reading." Ex. 18 at 24-25.

A December 7, 2009 PT Quarterly Progress Note reported that Q.S. continued to present with significant weakness of his trunk/core muscles; noted delays in gross motor development, balance, running speed and ability, strength, and motor planning and execution; and recommended the continuation of PT services. Ex. 16 at 1-2; Pl.'s Resp. 56.1 ¶ 45.

A December 8, 2009 OT Evaluation noted that Q.S. scored below average on testing for fine motor precision and upper limb coordination, which would impact his ability to successfully

---

[3] Dr. Thomas described "dyslexia" as difficulty interpreting the way language is codified into its written form. IHO Dec. at 36.

print or write letters and words; that he reflected difficulties in motor planning and vestibular skills; and recommended continuation of OT services.  Ex. 15 at 1-2; Pl.'s Resp. 56.1 ¶ 46.

During the 2009-10 school year, Q.S. received OT services on a weekly basis.  Ex. 12 at 1.  An April 2, 2010 OT Annual Report stated that the Student showed continued needs in both fine and gross motor performance and sensory processing, and recommended that OT services be increased to two forty-five minute sessions per week for the 2010-11 school year.  *Id.* at 1-2; Pl.'s Resp. 56.1 ¶ 47.

An April 5, 2010 PT report noted that Q.S. reflected "definite muscle weakness . . . [and problems with] static and dynamic balance, coordination and the execution of motor patterns," although noting that "poor attendance over the pas[t] 3 months makes it difficult to provide an accurate measurement of [his] level of motor performance."  Ex. 14 at 2; Pl.'s Resp. 56.1 ¶ 48.

Finally, an April 6, 2010 Annual Report from Q.S.' consultant teacher noted, among other things, that he exhibited "difficulty executing control over the sizing of his print," "makes several letter reversals when he writes," and that behavioral issues impeded his ability to be successful in his writing skills.  The report also noted that his organization skills continued to be an area of weakness, and that his impulsive behavior and hyperactivity were preventing him from being successful in school.  Ex. 13 at 1-2; Pl.'s Resp. 56.1 ¶ 49.

### C.  CSE Meeting to Develop the 2010-11 IEP

On August 4, 2010, the Parent and Q.S. moved to Amenia, New York and became residents of the District.  Pl.'s Resp. 56.1 ¶ 61.  The District held a CSE meeting on August 30, 2010 to prepare an IEP for the 2010-11 school year.  The Parent and her advocate were present at the meeting.  *Id.* ¶ 69.  The CSE reviewed Dr. Thomas' Fall 2009 report, which included earlier testing results (Ex. 18).  The CSE also discussed counseling services that Q.S. would receive.

Although she agreed that Q.S. needed counseling, the Parent did not agree with switching his therapist and providing him with pull-out services by more than one District therapist on a six-day cycle.  IHO Dec. at 15.[4]

The Parent testified that the District initially recommended OT therapy services twice a week for forty-five minutes.  However, according to the Parent, after the District's OT specialist visited Kildonan at her request, the specialist agreed that Q.S. was fine doing OT consults on a monthly basis.  IHO Dec. at 15, 17; *see* Ex. 9; Pl.'s Resp. 56.1 ¶ 80.  According to the Parent, Kildonan staff felt that Q.S. should not receive as much OT as recommended by the CSE because it would be disruptive to have him pulled out of the classroom.  IHO Dec. at 15-16.

In their resulting IEP for the 2010-11 school year, the District recommended that Q.S. be placed in a 12:1:1 integrated co-teaching class for English and Math.  Ex. 6 at 1.  Related services included, among other things, individual and group counseling services once per six day cycle for thirty minutes, and 1:1 OT services once per month.  *Id*. at 2.  The IEP did not recommend PT services for Q.S.; however, it required a 1:1 PT Consultation once per quarter.  *Id*.[5]

On September 8, 2010, the Parent enrolled Q.S. at Kildonan.  Pl.'s Resp. 56.1 ¶ 77.  On September 23, 2010, the Parent visited the District's second grade class and found it to be inappropriate for her son.  *Id.* ¶ 78.  By letter dated October 18, 2010, the Parent requested an

---

[4] The Parent wanted the District to pay for the counseling services of Dr. Tortora; however, the District refused this request.  Q.S. continues to see Dr. Tortora privately at the Parent's expense.  IHO Dec. at 17.

[5] Although not relevant to this appeal, the Court notes that the IHO concluded that the August CSE developed an IEP for the student, rather than an individualized education services program ("IESP"), based on the CSE's recommendation consisting of a specific integrated co-teaching program located at a placement within the district of residence.  IHO Dec. at 75-76.

impartial hearing seeking tuition reimbursement for her unilateral placement of Q.S. at Kildonan. Ex. 1.

### D.  The IHO Hearing

The impartial hearing officer ("IHO") conducted a three day hearing between February 17 and March 2, 2011.  Pl.'s Resp. 56.1 ¶ 86.  The District elected not to offer evidence at the impartial hearing to establish that it offered Q.S. an appropriate placement for the 2010-11 school year and, according to the IHO, conceded that it could not meet its burden of proof on this issue.  *Id.* ¶ 87; IHO Dec. at 3.  The Parent testified at the hearing and also presented as witnesses, Dr. Robert Lane, Academic Dean of Kildonan, Dr. Thomas, and Jodi Liston, the Parent's educational advocate.  Pl.'s Resp. 56.1 ¶ 88.  The District presented Cara Tomasseti, District School Psychologist, and Robert Wood, the District's CSE Chairperson.  *Id.* ¶ 89.

a.  <u>Kildonan's Program</u>

Dr. Lane testified that Kildonan is a private school that provides education for students with average to above average cognitive ability who present delays in the areas of reading, writing and spelling.  Tr. 122-23.  The school specializes in educating children with dyslexia.  Def.'s Resp. 56.1 ¶ 52.  Classes at Kildonan's elementary school consist of twenty-five students in grades two through six.  IHO Dec. at 22; Tr. 117.  Dr. Lane also described a typical day in the elementary program and the various classes and activities which Q.S. would attend.  IHO Dec. at 25-27.

Dr. Lane then explained that Orton-Gillingham instruction is used in the elementary school.  Each lesson in Orton-Gillingham is 1:1 and each lesson is planned and geared towards the particular student.  *Id*. at 23.  Dr. Lane described Orton-Gillingham instruction at Kildonan as "direct, explicit, . . . language-based . . . [and] also multisensory, structured, sequential and

cumulative, but . . . flexible.  Teachers look to activate the auditory, visual, and kinesthetic abilities of [each] student."  *Id.* at 23-24; Tr. 120.

However, Kildonan does not provide its students with OT or PT services.  Tr. 134, 187. Dr. Lane explained that if a student enters Kildonan with an IEP that provides for either OT or PT, the services are provided outside of the school day by the school district in collaboration with the parents.  IHO Dec. at 28.  Additionally, there is no psychologist or counselor on staff at Kildonan who could work with Q.S. on a regular basis as part of his program.  Dr. Lane testified that a parent may contract with a service provider independently, and that service would be available to the student during the school day.  *Id.* at 25.  Moreover, while Kildonan's program includes an equestrian class and after school physical activities, all students are required to participate in such activities regardless of whether or not they present with any individual weaknesses or needs in balance, strength, and agility.  Tr. 131-34, 186, 188.

Dr. Lane next explained that he thought Q.S. was appropriately placed at Kildonan—he based his opinion on the fact that Q.S. had been diagnosed with reading and writing disorders, and that he had attention difficulties and anxiety.  IHO Dec. at 25.  He also stated that Q.S. fit the range of scores and skills of other students at Kildonan.  *Id.*  In addition, Dr. Lane testified that he had visited four of Q.S.' classes over the course of the 2010-11 school year; however, his personal interaction with him was limited to sixty to ninety minutes.  Tr. 158-59, 202.

Dr. Lane testified that he believed that Kildonan would address Q.S.' reading and writing disorders.  He summarized the principal features at Kildonan that met his areas of deficiency as: (1) the individualized 1:1 Orton-Gillingham instruction that is geared exclusively to his areas of strength and weakness, including his fine motor difficulties; (2) the small class size, which provides him with the attention he needs in terms of feedback about skills he's learned or how he

12

is applying the skills he's learned from his tutorial; (3) the redirection and refocusing that he receives from his teacher; and (4) the consistency of Orton-Gillingham methodology that is used by all his teachers throughout the school day.  IHO Dec. at 25, 32.  In addition, Dr. Lane testified that there were no emotional issues that would interfere with Q.S.' ability to benefit from Kildonan's program.  *Id*. at 25.  Dr. Lane testified that Q.S.' physical activity needs would be addressed through his participation in the equestrian program and after school athletics.  He stated that learning how to ride a horse correctly requires a good amount of coordination, muscle control, and core body control.  *Id.* at 28.

Dr. Lane testified that Kildonan had not utilized a standardized measurement to determine whether Q.S. was making progress.  *Id*. at 29.  However, Kildonan administered the Gates-MacGinitie Reading Test – Fourth Edition, Level 1S, in October 2010 and Q.S. scored in the 38th percentile in word decoding and in the 49th percentile in comprehension.  In February 2011, Kildonan administered Level 2S of the Gates-MacGinitie test and Q.S. performed in the 96th percentile on word decoding, the 95th percentile in word knowledge, and the 79th percentile in comprehension.  Ex. 31 at 5.  Dr. Lane testified that although the scores on the Level 1S and Level 2S could not be directly compared, it was possible to infer that Q.S. was making progress because he was answering more questions correctly.  IHO Dec. at 29.

Dr. Lane also reviewed Q.S.' scores on the Woodstock Reading Mastery Test that was administered in October 2010.  He noted that although he appeared to perform well on the test of word identification, involving actual words, he did not perform nearly as well on "word attack," involving nonsense words.  *Id*. at 31; Ex. 31 at 5.

In addition, Dr. Lane discussed the Student's spelling scores from October 2010 and noted his performance to be in the 9th percentile.  Ex. 31 at 5.  Dr. Lane explained that even

though Q.S. had a good memory, he was unable to memorize each letter in a word.  However, he had made progress in spelling by February 2011, specifically in his ability to correctly match symbol to sound.  Dr. Lane explained that Q.S. was concentrating his writing on representing his thoughts into complete sentences, and "was very much in the beginning stages."  IHO Dec. at 30.

Dr. Lane described the progress observed by his Orton-Gillingham tutor.  Q.S. was unable to consistently differentiate between the short vowel sounds, and he compensated by using his good memory to memorize words as a whole, which is a strategy that "falls apart" once a student reaches the fourth or fifth grade and is responsible for much more information than he is able to memorize.  Accordingly, the tutor began "to do a lot of work on auditory discrimination," in particular short vowel sounds and in manipulating the sounds through different types of auditory devices.  *Id.*  Dr. Lane could not recall specific testing of Q.S.' auditory discrimination, and noted that his auditory difficulties could also be caused by problems with attention.  *Id.*; Tr. 144.

Finally, Dr. Lane testified that he has observed Q.S. in his class settings and that in a recent observation he was able to see that Q.S. was still demonstrating distractibility and continued to need redirection from the teacher.  He observed him twice, and both observations occurred within two weeks of the date of his testimony at the impartial hearing.  IHO Dec. at 31. Dr. Lane also confirmed that Q.S. does not take any formal tests or quizzes at Kildonan because the courses are ungraded until the fourth grade, when some math students are assessed by more formal measures, depending on their level of performance.  The remaining core academic courses are not formally assessed.  *Id.* at 32.

14

      b.  <u>Parent's Testimony</u>

The Parent testified that Q.S. now exhibited greater confidence and lower anxiety levels.

*Id*. at 20.  However, she noted that her son was "still struggling with a lot of things, in particular

with organizational issues and writing."  Tr. 246.

      c.  <u>Dr. Thomas' Evaluation</u>

Dr. Thomas testified that Q.S. experienced difficulty with executive and regulatory

functions.  IHO Dec. at 35.  She discussed her recommendations in her Fall 2009 Diagnostic

Psychological Testing Evaluation.  *Id*. at 37.  She explained that it was important for Q.S. to have

support for his executive functions in planning, organization and sequencing as he moved

through his work.  Tr. 325.  She also reiterated that he needed a cohesive program that integrated

OT, speech-language therapy, and PT.  IHO Dec. at 37; Tr. 324, 359-60.  Dr. Thomas also noted

that it would be important for Q.S. to work on social skills, and that emphasis in placement

should be on sensory motor integration and the learning issues.  Tr. 364, 401.

With respect to Kildonan, Dr. Thomas testified that it was "*probably* a good fit for the

Student" based on its ability to teach to his intelligence as well as to remediate his learning

disabilities and because it specializes in students with dyslexia and dysgraphia.[6]  *Id*. at 330

(emphasis added).  She noted that the class size is small, with a lot of one-to-one interaction, and

the environment was streamlined enough where he would not be overwhelmed or overly

stimulated.  He also would be around kids "like him."  *Id*. at 331; IHO Dec. at 38-39.  Dr.

Thomas testified that horseback riding might be helpful in addressing his physical weaknesses;

---

[6] Dr. Lane described "dysgraphia" as "difficulty with technically fine motor acts which manifest themselves in challenges with handwriting, writing numbers, and sometimes even typing or other fine motor skills."  IHO Dec. at 24-25.

however, she stated, "I don't know that horseback riding would fully address those issues."  Tr. 339.  Dr. Thomas never observed Q.S. at Kildonan and she never spoke to any of his Kildonan instructors.  *Id*. at 370.  Dr. Thomas' involvement with Q.S. had been primarily through testing, and she had not tested him since fall 2009.  IHO Dec. at 44.

### d.   Tomasseti's Testimony

Cara Tomasseti, the District's school psychologist, testified that she did not have prior contact with Q.S., was not a member of the August 2010 CSE, and had not spoken to any of his teachers.  Tr. 615-16.  Her testimony was based on her review of reports and evaluations regarding Q.S., including, but not limited to, Dr. Thomas' Fall 2009 evaluation.  Defs.' Resp. 56.1 ¶ 66; IHO Dec. at 53.  Tomasseti testified that she did not see any disability in Q.S.' reading skills and that it was too soon to conclude that he suffered from dysgraphia.  IHO Dec. at 62.  However, she agreed that writing skills were an area of weakness for Q.S.  *Id.*

### e.   Kildonan Progress Reports

The hearing record contained three Kildonan progress reports dated October 18, 2010, November 22, 2010, and January 17, 2011.  Exs. 27, 29, 31.  Kildonan staff evaluate a student's skills by generally describing his functioning level as "beginning, "developing," and "secure."  A "beginning" functioning level denotes that a student exhibits 0-25% compliance.  A "developing" functioning level is 25-75/80% compliance.  A "secure" functioning level is 80% or greater compliance.  Ex. 31 at 1.  The reports also evaluate a student's abilities across areas such as "Engages in Learning," "Demonstrates Academic Risk-Taking," and "Respects Thoughts and Feelings of Others."  *Id*. at 1-2.

### E.  The IHO's Decision

On May 30, 2011, the IHO issued a decision holding that the District had failed to provide Q.S. with a FAPE.  The IHO based her finding on the District's concession that it could not establish that its placement recommendation was appropriate.  IHO Dec. at 76.  The IHO also awarded the Parent tuition reimbursement for placement of Q.S. at Kildonan for the 2010-11 school year based on determination that the Parent met her burden with respect to the appropriateness of placement at Kildonan and that equitable considerations did not warrant a denial in the reimbursement sought.  *Id*. at 76-92.

As an initial matter, the IHO dismissed the District's contention that Q.S. did not actually suffer from a reading disorder.  The IHO noted that the District had included two reading goals and five writing goals to be addressed by a special education teacher in the August 2010 IEP.  *Id*. at 83.

Next, the IHO determined that Kildonan was appropriate to meet Q.S.' unique special education needs.  The IHO explained that Kildonan's 1:1 Orton-Gillingham tutorial addressed Q.S.' needs with respect to reading and writing.  *Id.* at 88.  Specifically, in the tutorial, Q.S. worked on "reading, cursive handwriting skills, phonemic awareness, syllable division, and spelling."  *Id*. at 79.  She also found that in light of his attention difficulties, Q.S. benefited from Kildonan's small, intensive environment—he attended small classes with direct teacher involvement that helped to keep him focused during lessons.  *Id*. at 88.

The IHO determined that Q.S. had progressed at Kildonan in his ability "to appropriately match symbol to sound."  *Id.*  The IHO also noted that Q.S. could hear and identify different sounds in words, understood the difference in short vowel sounds, and was working on long vowel sounds.  *Id*.  The IHO concluded that Q.S. was "very much in the beginning stages" of

organizing his thoughts and ideas into complete sentences.  *Id.*  The IHO also found that Q.S. was making progress in his other subjects, including math, literature, history and science.  *Id.* at 79-80.

The IHO further found that Q.S. continued to exhibit difficulty with distractibility and continued to require redirection; however, she determined that he was better able to redirect himself than earlier in the school year.  *Id.*  The IHO also cited the testimony of the Parent and Dr. Lane stating that Q.S.' anxiety had decreased since he began attending Kildonan, and the Parent's testimony that his self-esteem had improved.  *Id.*

The IHO found that the failure of Kildonan to furnish Q.S. with related services was not fatal to the Parent's position.  *Id.* at 85-88.  The IHO focused her analysis on the lack of discussion at the August CSE meeting of Q.S.' need for PT, OT and speech-language therapy, and the absence of any related service providers at the CSE meeting other than a PT assistant and a school social worker.  *Id.* at 85-87.  Further, the IHO noted that counseling services were available to Q.S. during the course of the school day through an independent contract between the Parent and service providers, and the Parent had privately obtained counseling for her son.  *Id.* at 85-86.

The IHO further found that the Orton-Gillingham tutorial addressed Q.S.' fine motor difficulties, and that he was working on developing fluid cursive writing skills.  *Id.* at 87.  Q.S. also worked on touch typing at Kildonan.  *Id.*  Additionally, the IHO determined that through Kildonan's equestrian program and after-school physical activities, Q.S. would be able to work on coordination, muscle, and core body control.  *Id.*  Relatedly, the equestrian program addressed, in part, his sensory integration deficits.  *Id.* at 87-88.  Finally, the IHO found that equitable considerations favored the Parent's claim for relief.  *Id.* at 91.

**F.  The SRO's Decision**

The District appealed the IHO's decision to the SRO on the basis that Kildonan was not

an appropriate private placement and that the equities did not favor tuition reimbursement.  SRO

Dec. at 1, 4.  On July 29, 2011, the SRO reversed the IHO's decision that Kildonan was an

appropriate placement for Q.S.  The SRO concluded that the hearing record "did not contain

sufficient evidence" to establish that Kildonan provided education instruction specifically

designed to meet the Student's unique needs, supported by such services that were necessary to

allow him to benefit from instruction.  *Id*. at 7.  Having found that Kildonan was an inadequate

placement for Q.S., the SRO did not address whether equitable considerations favored the

Parent's claim for tuition reimbursement.  *Id*. at 12.

The SRO relied on Dr. Thomas' recommendation that Q.S. should receive an academic

program in which intervention for his learning disabilities and support for his therapies are

integrated into his school day.  The SRO also noted Dr. Thomas' recommendation that it was

"important" that Q.S.' academic program not only remediate his learning disabilities, but also

teach to his intellectual strengths.  *Id*. at 8.

a.  Cognitive Needs

The SRO relied heavily on Dr. Thomas' Fall 2009 evaluation to determine that

Kildonan's program failed to address Q.S.' cognitive needs, which manifested mainly as a

sensory processing disorder and difficulties with executive functions.  Thus, the SRO concluded

that even though Dr. Lane testified that the use of individualized Orton-Gillingham was crucial

to Q.S.' academic program and tailored to his individual needs, "the hearing record offers no

description with respect to what areas of weakness the [Orton-Gillingham] program targeted."

*Id*.  Further, the SRO found that there was "no information" in the hearing record to reflect how

Kildonan addressed the Student's deficits in executive functions, including sequencing, which impeded his ability to function in the classroom.  *Id.*  Therefore, since there was "only limited information" in the record regarding how Kildonan was designed to meet Q.S.' cognitive deficits, the SRO concluded that the evidence weighed against a finding that the school was reasonably calculated to enable him to receive educational benefits.  *Id.*

b.   Social/Emotional Needs

The SRO specifically discussed the results of the SFFHC's March 2007 psychological testing and Dr. Graee's June 2008 psychiatric evaluation, which found that Q.S. struggled with anxiety, depression, somatic problems, attention problems, withdrawn behavior, and aggressive behavior.  *Id.* at 8-9.  The SRO noted that Kildonan did not have a psychologist or counselor on staff who could work with Q.S. on a regular basis as part of his educational program.  *Id.* at 9.  Further, he concluded that the evidence did not identify the strategies the school would employ to address his anxiety.  While the SRO cited the Parent's testimony that her son was more confident since entering Kildonan and that his anxiety had been reduced, he found that the hearing record did not contain any objective evidence to support this conclusion.  Accordingly, he concluded that Kildonan was not appropriate to meet the Student's social and emotional needs.  *Id.*

c.   Sensory Processing and Motor Needs

The SRO noted that Q.S. received one hour of OT per week during the 2009-10 school year.  *Id.* at 9 (citing Ex. 12 at 1).  He also cited the December 8, 2009 OT Evaluation, the April 2, 2010 OT Annual Report from Q.S.' private occupational therapist, and Dr. Thomas' Fall 2009 evaluation as evidence of his continued need for OT service.  *Id.*  The SRO highlighted that both

Q.S.' private occupational therapist and Dr. Thomas recommended continued provision of OT. *Id*. at 10.

The SRO found the hearing record to reflect that Q.S. required the intervention of a physical therapist.  *Id*. at 9.  The December 16, 2008 report of his private physical therapist indicated that Q.S. demonstrated low muscle tone and poor endurance, which affected this ability to focus throughout the day on academic challenges.  The report also indicated that Q.S. exhibited significant difficulties with sensory processing which affected his ability to develop core strength.  *Id*. at 10.  The report recommended that Q.S. would benefit from continued PT. *Id*.

Despite these aforementioned recommendations, the SRO found that Kildonan's program did not address Q.S.' OT and PT needs.  Further, Kildonan could not incorporate the recommendations into his school program.  Specifically, the SRO found that the hearing record failed to offer "any specific details" regarding how Kildonan's program met Q.S.' fine motor needs.  *Id*.  In addition, the SRO found that the hearing record was devoid of specific information detailing how the equestrian program addressed his individual gross motor needs, nor did it offer any information regarding the equestrian program instructor's background, credentials or experience working with children with OT needs.  *Id*.  "Rather, the hearing record reflects that through the equestrian program[,] students learn how to safely ride horses, care for them, and complete barn chores."  *Id*.  While the record showed that the equestrian program "was an enjoyable extracurricular activity," it failed to describe what areas of motor deficit the program was designed to address.  *Id*.  Moreover, as all students of Kildonan participated in the equestrian program, the program was not individualized to meet Q.S.' unique education needs.  *Id*. at 11.

21

        d.  <u>Evidence of Progress at Kildonan</u>

Finally, the SRO found that while the hearing record offered anecdotal information regarding Q.S.' progress, there was scant objective evidence to support the "[P]arent's assertion that the [S]tudent made 'substantial progress in all areas' at Kildonan." *Id*. at 11.  First, the SRO noted that the record contained three Kildonan progress reports for the 2010-11 school year, all three of which simply evaluated Q.S.' functioning as either "beginning," "developing," or "secure." *Id*.  The SRO found that while these reports provided narratives regarding Q.S.' general functioning in school and the lessons on which he was working, they did not contain any objective data to support the teachers' statements. *Id*.  The SRO noted that rather than providing an assessment of Q.S. in his specific areas of identified need, his teachers rated him across general areas of performance, such as "understands concepts," "engages in learning," and "demonstrates perseverance." *Id*.  Furthermore, the SRO noted that none of Q.S.' teachers were called as witnesses; "therefore, there was no testimony to clarify any of the teachers' assessments or observations that could be related to the [S]tudent's educational progress." *Id*.  Additionally, Dr. Lane testified that Kildonan students did not actually receive grades that could be used to measure progress. *Id*.  Dr. Lane also admitted that he had never provided direct instruction to Q.S., nor had he formally assessed him in a classroom setting. *Id*. at 12.

Accordingly, the SRO found that the results from the October 2010 and February 2011 administrations of the word decoding and comprehension subtests of the GMRT-4 were "the sole objective data included in the hearing record regarding the [S]tudent's functioning at Kildonan." *Id*.  The SRO concluded that the hearing record did not contain any formal assessments regarding his abilities at Kildonan in the following functional areas:  social and emotional; fine and gross motor; attention; and executive. *Id*.  Therefore, the SRO found that given the limited amount of

objective information contained in the record regarding Q.S.' progress, the evidence did not

support the conclusion that Kildonan was an appropriate placement.  *Id*.

### G.  Procedural History

On November 22, 2011, the Plaintiff commenced the present action to appeal the SRO's

decision.  Doc. 1.  On May 25 and July 9, 2012, the parties made the present motions for

summary judgment.  Docs. 11, 28.

## II.  Discussion

### A.  Standard of Review

#### a.  IDEA

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the

court must review the entirety of the administrative record in addition to supplemental evidence

upon either party's request.  20 U.S.C. § 1415(i)(2)(c).  Though IDEA appeals tend to come

before the district court as motions for summary judgment, *see e.g. Viola v. Arlington Cent. Sch.

Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006), the existence of a genuine issue of material fact

does not necessarily result in denial of the motion.  *J.R. v. Bd. of Educ. of the City of Rye Sch.

Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, a motion for summary judgment in the

IDEA context is more akin to an appeal from an administrative determination.  *M.H. v. N.Y.C.

Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (citing *Lillbask ex rel. Mauclaire v. State of

Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).  Courts reviewing administrative

decisions under the IDEA must determine whether the decision is supported by a preponderance

of the evidence, taking into account the record from the administrative proceedings and

additional evidence presented to the district court by the parties.  *Grim v. Rhinebeck Cent. Sch.

Dist.,* 346 F.3d 377, 380 (2d Cir. 2003) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)).  However, in

conducting this review, the court may reject factual findings which are not supported, or are controverted, by the record.  *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011) (citation omitted).

The rulings of the IHO and the SRO are subject to "independent" judicial review, however, a federal court's role in reviewing state educational decisions under the IDEA is "circumscribed," as the judiciary "generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citation and internal quotation marks omitted).  Upon independently reviewing the administrative record, the court must make a determination based upon a preponderance of the evidence, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982).  Rather, the federal courts must accord "substantial deference" to such findings.  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005).  Furthermore, district courts should abstain from making "subjective credibility assessments."  *M.H.*, 685 F.3d at 240 (quoting *Grim*, 346 F.3d at 383) (internal quotation marks omitted).

As the Second Circuit has recently articulated, the district court's analysis of the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether it was based on substantial greater familiarity with the evidence and the witnesses than the reviewing court."  *M.H.*, 685 F.3d at 244.  That being said, the court's conception of whether the administrative findings are persuasive "must also be colored by an acute awareness of institutional competence and role . . . [and] courts are required to remain conscious of these considerations in determining

24

the weight due any particular administrative finding."  *Id.*  District courts should afford more

deference to administrative findings as to the substantive adequacy of an IEP, *id.* (citing *Cerra*,

427 F.3d at 195), and to any findings "grounded in thorough and logical reasoning,"  *id.*, than to

determinations addressing whether an IEP was developed according to the proper methods.  *Id.*

District courts are also advised to show greater deference when "its review is based entirely on

the same evidence as that before the SRO than when the district court has before it additional

evidence that was not considered by the state agency."  *Id.*

Finally, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's

decision may be afforded diminished weight."  *E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11

Civ. 3730 (LAP), 2012 WL 4571794, at *5 (S.D.N.Y. Sept. 29, 2012) (citations and internal

quotation marks omitted).  Therefore, courts "defer to the final decision of the state authorities,

even where the reviewing authority disagrees with the hearing officer."  *Id.* (citation and internal

quotation marks omitted); *see also Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415,

426 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) (deferring to the SRO's

determination because doing otherwise would invite the court to substitute its "own uninformed

judgment for the opinions of persons with far greater expertise without having any basis to do so

. . . .").  However, when the district court correctly finds that the SRO's determinations are

"insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more

thorough and carefully considered decision of an IHO," the court may "consider the IHO's

analysis, which is also informed by greater educational expertise than that of judges, rather than

[] rely[ing] exclusively on its own less informed judgment.  *M.H.*, 685 F.3d at 246.

### b.  Claims for Tuition Reimbursement

If a state receiving IDEA funding fails to provide a disabled child with a FAPE, the child's parents may remove the child to an appropriate private school and then seek tuition reimbursement from the state.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009); *see also C.L. v. N.Y.C. Dep't of Educ.*, 12 Civ. 1676 (JSR), 2013 WL 93361, at *4 (S.D.N.Y. Jan. 3, 2013).  Generally, tuition reimbursement for private placement is warranted if:  (1) the IEP proposed by the school district was inappropriate and (2) the private placement was appropriate to the child's needs.  *Sch. Comm. of Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 370 (1985); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006).  However, even if these two requirements are satisfied, the court retains discretion whether to award tuition reimbursement.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added). "Moreover, because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.' " *Frank G.,* 459 F.3d at 363–64 (quoting *Burlington,* 471 U.S. at 374) (alteration in original).  Courts also retain discretion to reduce the amount of a reimbursement award if warranted by the equities; for example, if the parents failed to provide the school district with adequate notice of their intent to enroll their child in a private school.  *Forest Grove,* 557 U.S. at 247.

Here, because neither party contests the IHO's decision that the District denied Q.S. a FAPE, the Court only addresses whether Kildonan was an appropriate placement for Q.S. during the 2010-11 school year.  On this issue, the Plaintiff bears the burden of proof, even if the District's program was inappropriate.  *See Frank G.,* 459 F.3d at 364 ("Parents seeking

reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate."); *Weaver*, 812 F. Supp. 2d at 522.

In general, the same considerations and criteria that apply in determining whether a school district has provided a child with a FAPE should be considered in determining the appropriateness of the parents' placement. *Gagliardo,* 489 F.3d at 112 (citation omitted). Therefore, when evaluating whether the parents' unilateral placement is appropriate, the issue is whether the placement was "reasonably calculated to enable the child to receive educational benefits," so that the placement is "likely to produce progress, not regression." *Frank G.,* 459 F.3d at 364 (citation and internal quotation marks omitted). In undertaking this analysis, "[n]o one factor is necessarily dispositive," *id.*, and the main question is whether the private placement "provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *M.H.*, 685 F.3d at 246 (quoting *Gagliardo,* 489 F.3d at 115) (emphasis in original) (internal quotation marks omitted); *see also Frank G.,* 459 F.3d at 364 ("[C]ourts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.").

Accordingly, a court may consider the student's progress in private placement, but the "the focus must remain on whether the placement satisfies the student's unique needs." *Weaver*, 812 F. Supp. 2d at 523. "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit," *Frank G.,* 459 F.3d at 364, but academic success in a private placement setting alone is not enough. *Weaver*, 812 F. Supp. 2d at 523 (citation omitted). Accordingly, "even where there is evidence of success in the private placement, courts should not disturb a state's denial of IDEA reimbursement where the chief benefits of the chosen

school are the kind of advantages that might be preferred by parents of any child, disabled or not." *M.H.*, 685 F.3d at 246 (alterations, citation and internal quotation marks omitted).

The Court notes that the standard applied to the parents' private placement is less restrictive than that imposed on school authorities when assessing whether the state provided a student with a FAPE. *Weaver*, 812 F. Supp. 2d at 523 (citations omitted). The "parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." *Frank G.,* 459 F.3d at 365. Rather, the parents must show that the "placement provides educational instruction specially designed to meet the unique educational needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id*. (citation and internal quotation marks omitted).

Finally, the IDEA exhibits a "strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Grim,* 346 F.3d at 379 (alteration in original) (quoting 20 U.S.C. § 1412(a)(5)). Although parents may not be subject to the same mainstreaming requirements as a school district, the IDEA's requirement that a child be educated in a mainstream environment to the extent possible may be considered when determining if the parents' unilateral placement was appropriate. *C.L. v. Scarsdale Union Free Sch. Dist.*, 11 Civ. 5242 (CS), 2012 WL 6646958, at *5 (S.D.N.Y. Dec. 21, 2012); *see Weaver*, 812 F. Supp. 2d at 523-24.

**B.  The SRO's Decision Merits Deference**

The Plaintiff argues that the SRO's decision is not entitled to deference from this Court because the SRO (1) ignored the IHO's credibility determinations, (2) placed undue weight on Dr. Thomas' Fall 2009 Diagnostic Psychological Testing Evaluation, Ex. 18, and (3) erroneously

determined that there was insufficient evidence in the record to find that placement at Kildonan was appropriate.

First, the Plaintiff argues that the SRO "erroneously substituted his own credibility assessments for those of the IHO."  Pl.'s Mem. L. 5.[7]  However, Plaintiff fails to identify any particular instance in which the SRO either credited testimony that the IHO had discredited, or discredited testimony credited by the IHO.  Rather, the situation here is simply the commonplace occurrence where the IHO and SRO reviewed the same testimony and drew differing conclusions.  This "does not mean that the SRO improperly ignored the IHO's determinations, or that the SRO's review was not thorough and careful."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 00157 (LTS), 2011 WL 5130101, at *8 (S.D.N.Y. Oct. 28, 2011) (citing *R.R. v. Scarsdale Union Free Sch. Dist.,* 366 F. App'x 239, 242 (2d Cir. 2010) (rejecting the argument that the SRO ignored the IHO's findings where, as here, the record did not reveal any instance where the SRO did so, nor did appellants point to one)); *S.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 870 (DLC), 2011 WL 5419847, at *15 (S.D.N.Y. Nov. 9, 2011) (finding that there was no credibility dispute when the SRO did not make a judgment as to the veracity of the parents' purported beliefs about what was right for their child because "[t]he conflict here is not which side is truthful.  Rather, it is a disagreement about educational policy and the legal obligations of the [District] under the IDEA, an area in which the SRO is accorded deference.").  Moreover, deference to the SRO is particularly appropriate where, as here, the SRO conducted a thorough

---

[7] Plaintiff points out that the IHO disagreed with Tomasseti's testimony that the Student suffered from reading and writing disorders and contends that the IHO found Tomasseti "to lack credibility."  Pl.'s Reply Mem. L. 4-5. However, the IHO never found Tomasseti's testimony to lack credibility; the IHO merely found that the evidence in the record did not support her testimony.  IHO Dec. at 83.  Moreover, Tomasseti's testimony is not relevant to the issues presently before the Court as the SRO did not challenge the IHO's determination that Q.S. did indeed experience difficulties with reading and writing.

review of the entire record before the IHO and has clearly explained the basis for his

conclusions.  *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir. 1998); *W.S.*

*ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 137 (S.D.N.Y. 2006).

Second, the Plaintiff argues that the SRO placed undue weight, and relied "almost

exclusively," on Dr. Thomas' Fall 2009 Diagnostic Psychological Testing Evaluation, Ex. 18.

Pl.'s Opp. Mem. L. 8.  To be sure, this case presents an unusual circumstance—the Parent is

asking the Court to give less weight to the testimony of her witness.  Specifically, the Plaintiff

argues that reliance on such a privately commissioned evaluation would create the presumption

that such reports are entitled to "complete deference" by a district court even in the face of

contrary evidence in the record.  *Id*.  The Court finds no legitimate basis for this argument.  In

fact, as noted by the District, the Plaintiff's complaint of the SRO's reliance on this report is

"curious" given that the Parent herself commissioned the evaluation, called Dr. Thomas as a

witness at the impartial hearing, and in her Local Rule 56.1 Statement described the evaluation

as a "comprehensive assessment performed by . . . an experienced educational psychologist."

Def.'s Reply Mem. L. 3 n.2; Def.'s Resp. 56.1 ¶ 12.

As an alternative to Dr. Thomas' evaluation and recommendations, the Plaintiff asks the

Court to rely on the information in the August 2010 IEP—which she rejected at the time it was

offered—as accurately stating Q.S.' unique needs, including the need for provision of related

services.  Pl.'s Opp. Mem. L. 9.  In response, the District notes that the Plaintiff has failed to

explain why the August 2010 IEP would provide a more reliable source of information than the

evaluations and reports prepared by professionals who interacted with and evaluated Q.S., such

as Dr. Thomas.  Def.'s Reply Mem. L. 3.  Further, the District highlights that it did not attempt to

defend the August 2010 IEP as meeting the IDEA's procedural and substantive requirements,

including with respect to its statements regarding Q.S.' needs.  Therefore, the District asserts that the "IHO's findings as to the Student's 'unique needs' were . . .  neither thorough nor carefully reasoned to the extent they were based primarily on the District's [IEP], and without regard to more probative evidence in the record."  *Id*. at 4.  The Court agrees.  The SRO correctly based his findings regarding Q.S.' cognitive, social, emotional, and sensory processing and motor needs on the assessments and opinions of Q.S.' own service providers and evaluations.

Third, the Plaintiff contends that the SRO incorrectly based his findings on a purported lack of evidence in the record regarding the adequacy of Kildonan, rather than requesting the submission of additional evidence.  Pl.'s Mem. L. 16-17.  The Plaintiff asserts that the SRO, having found gaps in the hearing record, had a duty to request the submission of additional evidence, "inasmuch as the IDEA requires, *inter alia*, that the SRO . . . seek additional evidence, if necessary."  *Id*. (emphasis in original).  Plaintiff cites to 34 C.F.R. 300.514(b)(2)(iii) in support of her proposition, *id*. at 17; however, the federal regulation only requires the SRO to seek additional evidence only "*if necessary*."   34 C.F.R. 300.514(b)(2)(iii) (emphasis added).  Consistent with the federal regulation, New York's regulations provide that the SRO "*may* seek additional oral testimony or documentary evidence *if* the [SRO] determines that such additional evidence is necessary."  8 N.Y.C.R.R. 279.10(b) (emphasis added).  Accordingly, an SRO is only obligated to seek additional evidence where the SRO concludes that, in the absence of such evidence, he or she is unable to render any decision at all.  *See* Def.'s Opp. Mem. L. 5.

Regardless, as noted above, the Plaintiff bears the burden of demonstrating that the SRO's determination is not supported by the preponderance of the evidence.  *See Frank G.,* 459 F.3d at 364; *Weaver*, 812 F. Supp. 2d at 522.  Here, as in *Weaver*, "[d]espite the fact that the SRO based his decision largely on an absence of concrete information about the program [Q.S.] .

. . was offered at Kildonan, Plaintiff[] ha[s] not availed [herself] of the opportunity to present

new, and more specific, evidence to fill in the gaps identified by the SRO."  *Weaver*, 812 F.

Supp. 2d at 524.  Moreover, in the Complaint, the Plaintiff asked the Court to convene

supplemental proceedings to accept new evidence pertinent to Q.S.' progress at Kildonan in his

main areas of disability.  Complaint, ¶ 18; Doc. 1.  However, the Plaintiff failed to follow up on

this request.  *Weaver*, 812 F. Supp. 2d at 524 n.10.  Accordingly, the Court will give appropriate

deference to the SRO's careful and thorough decision.

### C.  Failure to Show That Kildonan Addressed Q.S.' Unique Needs

In opposing the SRO's conclusion that the Parent failed to show how Kildonan addressed

Q.S.' unique needs, the Plaintiff does not specifically address or challenge any findings of the

SRO.  Rather, the Plaintiff merely points to the IHO's findings and asks the Court to accept them

as true.  *See* Pl.'s Opp. Mem. L. 5-8.

The Plaintiff asserts that the SRO ignored the August 2010 IEP which found that Q.S.

had no cognitive deficits that needed to be addressed through special education.  Pl.'s Opp.

Mem. L. 8.  However, the Parent does not point to any testimony or any other evidence to

contradict the evidence establishing that Q.S. suffered from cognitive difficulties, that such

difficulties interfered with his ability to learn, or the finding that there was only limited evidence

demonstrating how Kildonan would address those needs.  The Court finds that the evidence

supports the SRO's conclusion that Q.S. suffered from cognitive deficits, including sensory

processing and executive function difficulties.  Furthermore, Dr. Thomas testified that Q.S.

needed a highly individualized program that offered structure and support for his executive

functions.  The record also supports the SRO's finding that there was insufficient evidence to

establish that Kildonan's program specifically addressed the Student's cognitive needs.  *See*

*Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12, 16 (2d Cir. 2011) (upholding SRO's finding that parents failed to show how Kildonan addressed child's needs related to attentional difficulties and difficulties with organization and completing assignments); *Matrejek*, 471 F. Supp. 2d at 428-30 (concluding that parents failed to demonstrate that Kildonan was an appropriate placement for child because the school's program did not satisfy several of child's needs as recommended by various evaluators, including serious attention deficits and problems completing work).

The Plaintiff also argues that Q.S.' learning disability should take priority over his social and emotional needs when considering the adequacy of his placement. Pl.'s Reply Mem. L. 5. Specifically, Plaintiff points to Dr. Thomas' testimony in which she explained that emphasis should be placed on Q.S.' learning disabilities and sensory motor issues. Tr. 401. The Second Circuit in *Davis* considered a similar argument that an SRO placed too much weight on the degree to which Kildonan's program failed to address what the parents considered to be ancillary skill areas and too little weight on the school's asserted ability to help the child with his reading, writing and math deficits. The *Davis* court stated: "[W]e recognize that our inquiry in assessing a particular placement's appropriateness must focus not on the general benefits a school may impart but rather on the degree to which it addresses a student's *particular* needs." *Davis*, 431 F. App'x 12, 16 (emphasis in original). Here, an analysis of Q.S.' particular needs reveals that, in addition to this sensory motor and learning issues, he suffered from anxiety, aggression and had difficulty with peer interactions. Kildonan's program did not address those needs. Dr. Lane's own testimony confirmed that Kildonan offered no counseling or other services to address Q.S.' social and emotional needs. *Gagliardo,* 489 F.3d at 11, 113-14 (reversing a district court finding that a private placement as adequate when it failed to provide services for student's emotional

33

disorder, which included social anxiety and poor social perception); *Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist.*, 05 Civ. 0398 (NAM) (GHL), 2009 WL 890625, at *27-28 (N.D.N.Y. Mar. 31, 2009) (finding private placement inadequate in light of child's documented emotional and behavioral issues and the failure of placement to provide appropriate counseling or therapy services).

The only social and emotional services that Q.S. was to have received were the private counseling services of Dr. Tortora, a dance movement psychotherapist—for which the Parent contracted privately. However, the IHO in her decision merely discussed that the Parent had contracted for this service and made no finding that Dr. Totora's counseling was adequate to meet Q.S.' social and emotional needs. There was no evidence was presented to establish Dr. Tortora's qualifications, the focus of her therapy, or the type of services provided. *See generally R.S. ex rel. A.S. v. Lakeland Cent. Sch. Dist.*, 09 Civ. 9874 (JGK), 2011 WL 1198458, at *5 (S.D.N.Y. Mar. 30, 2011), *aff'd sub nom. R.S. ex rel A.S. v. Lakeland Cent. Sch. Dist.*, 471 F. App'x 77 (2d Cir. 2012) (discussing the absence of evidence as to the nature and qualifications of private services obtained by parents for a student placed at Kildonan). Dr. Tortora did not testify at the hearing and no records were introduced as to the nature of her services or how those services related to Q.S.' unique needs. In light of the speculative nature of Dr. Tortora's services, and the lack of provision of social and emotional services, the Court defers to the SRO's opinion.

The SRO also found insufficient evidence to establish that Kildonan addressed Q.S.' OT and PT needs. It is undisputed that Kildonan did not offer Q.S. any formal PT or OT services during the 2010-11 school year. In response, Plaintiff merely repeats the findings of the IHO that Q.S.' fine motor needs were addressed through the various programs at Kildonan. Pl.'s Opp.

34

Mem. L. 6-7.  However, the SRO discussed the claims that some of Q.S.'s needs might be indirectly addressed through Kildonan's instruction in cursive writing skills and horseback riding and found them wanting.  Further, the SRO observed that these activities were uniformly available to all students and thus not specifically designed to address the Student's unique needs in the areas of fine motor development, gross motor development or sensory processing.  "As such, it is the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not."  *R.B. v. N.Y.C. Dep't of Educ.*, 713 F. Supp. 2d 235, 246 (S.D.N.Y. 2010) (quoting *Gagliardo,* 489 F.3d at 115) (alterations and internal quotation marks omitted).  In addition, the Court notes Dr. Thomas' testimony that while horseback riding might be helpful in addressing some of the Student's motor deficits, she was not sure that it would "fully address those issues."  Tr. 339.

The Court's review of the evidence indicates that the record was generally sparse as to whether Kildonan met Q.S.' unique needs with respect to his cognitive functions, social and emotional issues, and fine and gross motor skills.  Accordingly, the Court affirms the SRO's conclusion that the Parent failed to present sufficient evidence to demonstrate that Kildonan was appropriate to meet Q.S.' unique needs.

### D.  Lack of Evidence of Student's Progress at Kildonan

Finally, Plaintiff argues that Q.S.' progress in reading and writing at Kildonan demonstrates the appropriateness of his placement.  Specifically, Plaintiff asks the Court to accept the IHO's findings and rely on Dr. Lane's testimony as to Q.S.' progress.  Pl.'s Opp. Mem. L. 9; Pl.'s Mem. L. 14.  However, as noted by the District, the Plaintiff does not identify any error of the SRO that merits reversal, she simply notes that his findings were contrary to those of the IHO.  Def.'s Reply Mem. L. 1.  The Plaintiff also submits that the District has failed

35

to present evidence to dispute Q.S.' progress at Kildonan.  Pl.'s Reply Mem. L. 8.  As noted above, however, the burden is on the Plaintiff, and not the District, to prove the appropriateness of the unilateral placement.  *Frank G.,* 459 F.3d at 364.  Moreover, the Court agrees with the SRO's finding that the hearing record offers only anecdotal information regarding Q.S.' progress and scant objective evidence to support the assertions of Dr. Lane and the Parent that Q.S. made progress at Kildonan.  *See C.L. v. Scarsdale Union Free Sch. Dist.*, 10 Civ. 4315 (CS), 2012 WL 983371, at *12 n.17 (S.D.N.Y. Mar. 22, 2012) (upholding an SRO's determination that unilateral placement school was inappropriate even though parent testified that the student was "happier, more self-confident, and less anxious" while attending private placement because "this evidence is not determinative given courts' preference for 'objective' evidence at this stage of review."). For example, none of Q.S.' teachers at Kildonan testified at the impartial hearing to offer any evidence of progress.  Also, the progress reports introduced at the hearing did not provide objective measurements of performance but instead assessed Q.S.' abilities within broad parameters identified as "beginning," "developing," and "secure."  Kildonan also provided only general narratives of Q.S.' functioning in the school and the lessons he was receiving.  *R.S. ex rel. A.S.*, 2011 WL 1198458, at *6 (finding that placement at Kildonan was inappropriate when plaintiffs failed to present objective data through which the court could evaluate the child's progress).

Relatedly, the Plaintiff also argues that the SRO failed to rely on evidence of Q.S.' progress at Kildonan as evidenced in the October 2010 and February 2011 GMRT-4 Tests.  Pl.'s Reply Mem. L. 9.  The SRO found these testing results to be "sole objective data" in the record regarding the Student's progress at Kildonan.  SRO Dec. at 11.  However, the only areas that were tested in both October and February were word decoding and comprehension.  Further,

while Dr. Lane inferred that Q.S. was making progress as a result of his answering more

questions correctly, he admitted that the scores on the two tests could not be directly compared.

In addition, as noted by the SRO, the hearing record did not contain any formal assessment

regarding Q.S.' progress in the areas of social and emotional, fine and gross motor, attention, and

executive functions.  In any event, the evidence of his progress that *was* presented is not so

substantial that it warrants reversal of the SRO's finding that Kildonan's program was not

specifically designed to meet Q.S.' unique needs.  *See Gagliardo,* 489 F.3d at 115 ("[E]ven

where there is evidence of success, courts should not disturb a state's denial of IDEA

reimbursement" unless the private placement "provides education instruction *specifically*

designed to meet the *unique* needs of a handicapped child.") (alteration in original) (citation and

internal quotation marks omitted); *M.S. ex rel. S.S. v. Bd. of Educ.,* 231 F.3d 96, 105 (2d

Cir.2000), *abrogated on other grounds by Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 57–58

(2005) ("An assessment of educational progress is a type of judgment for which the district court

should defer to the SRO's educational experience, particularly where ... the district court's

decision was based solely on the record that was before the SRO.").[8]

---

[8] The District also asserts that Kildonan is a highly restrictive setting, with twenty-five students in the elementary school, all of whom are learning disabled, and that the Parent did not meet her burden that Q.S. required such placement and thereby deprived Q.S. of an opportunity to engage with nondisabled peers.  Def.'s Mem. L. 15.  The Court notes that the SRO did not reach a finding on this issue.  Plaintiff in response argues that the District is barred from raising such an argument as it failed to raise the issue to the IHO or SRO.  Pl.'s Opp. Mem. L. 10.  Plaintiff is incorrect; the District raised the issue of least restrictive environment to the SRO.  SRO Dec. at 4: District's Petition to SRO, at 19 ¶ A.  However, as the Court has already determined that the Parent's unilateral placement at Kildonan was inappropriate, it need not reach the issue of whether Kildonan was the least restrictive environment for Q.S.

### III. Conclusion

The Plaintiff has failed to establish by a preponderance of the evidence that Kildonan served Q.S.' unique needs. While the Court sympathizes with the Plaintiff's desire to procure the best possible education for Q.S., "it is not the role of the District Court to award tuition reimbursement where it is not shown that a particular placement—even if highly beneficial for the child—is suited to meet a child's unique needs . . . ." *C.L. v. Scarsdale Union Free Sch. Dist.*, 11 Civ. 5242 (CS), 2012 WL 6646958, at *10 (S.D.N.Y. Dec. 21, 2012).

Accordingly, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions (Docs. 11, 28) and to close this case.

SO ORDERED.

Dated:     March 19, 2013
           White Plains, New York

Edgardo Ramos, U.S.D.J.